# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ———————————————— ) | |
| COLUMBIA SAINT MARY'S ) | |
| HOSPITAL MILWAUKEE, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 09-2031 (ABJ) |
| ) | |
| KATHLEEN SEBELIUS, Secretary, ) | |
| U.S. Department of Health & Human ) | |
| Services, ) | |
| ) | |
| Defendant. ) | |
| ————————————————) | |

## MEMORANDUM OPINION

Plaintiff, Columbia St. Mary's Hospital Milwaukee, Inc., has brought this action against

defendant Kathleen Sebelius, Secretary of the U.S. Department of Health and Human Services,

for improperly calculating the hospital's Medicare disproportionate share hospital ("DSH")

adjustment for fiscal year 1999. The DSH adjustment is the means by which hospitals that serve

a disproportionately large number of low income patients can receive additional federal financial

assistance. This lawsuit concerns the statutory provision that sets forth how the DSH adjustment

is to be calculated, and it centers on the meaning of the term "entitled" to Medicare in that

provision. In 2004, the Secretary issued a formal rulemaking explaining her current

interpretation of the term, which she began implementing in 2000. But as of 1999, the Secretary

applied a different interpretation of the statute.

This case presents two issues: whether the Secretary's current interpretation of the

statute is supported by the statute's plain terms or is otherwise permissible, and whether the

application of that interpretation to Columbia St. Mary's FY 1999 DSH adjustment is proper.

The D.C. Circuit has already ruled that the Secretary's interpretation is not inconsistent with the statute, leaving open the question of whether it is reasonable.  *Northeast Hosp. v. Sebelius*, 657 F.3d 1 (D.C. Cir. 2011).  But this Court need not rule on that issue either because it holds that even if it assumes the Secretary's interpretation is permissible, applying that interpretation to Columbia St. Mary's 1999 DSH adjustment would be an improper retroactive application of the agency's current rule.  The Court, therefore, grants the hospital's the motion for summary judgment and denies the Secretary's cross-motion for summary judgment.

I.      **BACKGROUND**

        **A.  The DSH Adjustment**

        The federal Medicare program provides healthcare coverage to individuals who are at least 65 years old and eligible for Social Security benefits, among others.  42 U.S.C. § 402. Medicaid programs are state-run programs that provide healthcare coverage to certain low income individuals.  42 U.S.C. § 1396.  Under both programs, the federal government reimburses healthcare providers for the services they provide to Medicare and Medicaid enrollees.  *See* 42 U.S.C. § 1395ww(d).  The Department of Health and Human Services ("HHS") administers both programs, and the Center for Medicare and Medicaid Services ("CMS"), which is part of HHS, is responsible for reimbursing providers.  *See* 42 U.S. C. §§ 1395h, 1395u.

        Hospitals that serve a large number of low income patients can receive additional reimbursement from the federal government based on the Medicare DSH adjustment.  42 U.S.C. §1395ww(d)(5)(F)(i)(I).  This adjustment does not calculate the actual number of low income individuals a hospital serves, but rather is an indirect, or "proxy" measurement.  *Catholic Health Initiatives v. Sebelius*, 841 F.Supp.2d 270, 272 (D.D.C. 2012), citing H.R. Report No. 99–241, at

16 (1985), *reprinted in* 1986 U.S.C.C.A.N. at 594.   This proxy is calculated by adding two

fractions:  the Medicare fraction, sometimes called the SSI fraction, and the Medicaid fraction.

The statute defines the Medicare fraction as follows:

> the fraction (expressed as a percentage), the numerator of which is the
> number of such hospital's patient days for such period which were made
> up of patients who (for such days) were entitled to benefits under part A of
> this subchapter and were entitled to supplementary security income
> benefits (excluding any State supplementation) under subchapter XVI of
> this chapter, and the denominator of which is the number of such
> hospital's patient days for such fiscal year which were made up of patients
> who (for such days) were entitled to benefits under part A of this
> subchapter,

42 U.S.C. § 1395ww(d)(5)(F)(vi)(I).  It defines the Medi*caid* fraction this way:

> the fraction (expressed as a percentage), the numerator of which is the
> number of the hospital's patient days for such period which consist of
> patients who (for such days) were eligible for medical assistance under a
> State plan approved under subchapter XIX of this chapter [i.e., Medicaid],
> but who were not *entitled* to benefits under part A of this subchapter [i.e.,
> Medicare] and the denominator of which is the total number of the
> hospital's patient days for such period.

42 U.S.C. §1395ww(d)(5)(F)(vi)(II) (emphasis added).   The equation below summarizes this

calculation:

| **Medicare Fraction** | **+** | **Medicaid Fraction** | **=** | **DSH Adjustment** |
|---|---|---|---|---|
| number of patient days for patients entitled to Medicare Part A and to SSI | | number of patient days for patients eligible for Medicaid, but not "entitled" to Medicare Part A | | |
| number of patient days for patients who were entitled to Medicare Part A | | total number of patient days | | |

CMS delegates the task of calculating the DSH adjustment to "fiscal intermediaries,"

which are typically private insurance companies acting as the Secretary's agent.  *Northeast*

*Hosp. v. Sebelius*, 657 F.3d 1, 3 (D.C. Cir. 2011).  To obtain additional reimbursement under the

DSH adjustment, hospitals submit data to these fiscal intermediaries, which calculate the

adjustment for the relevant time period and issue a notice of program reimbursement to the hospital. 42 C.F.R. § 405.1803. If a hospital disagrees with the intermediary's calculation, the hospital can appeal to an administrative body appointed by the Secretary: the Provider Reimbursement Review Board ("PRRB"). 42 U.S.C. § 1395*oo*(a); *see also Northeast Hosp.*, 657 F.3d at 3–4. The Secretary can then affirm, modify, or reverse the PRRB. 42 U.S.C. §§ 1395*oo*(d)–(f).

### B. This Case and Procedural History

Columbia St. Mary's is an acute care hospital in Milwaukee, Wisconsin that participates in the federal Medicare program. Compl. ¶ 6. For the period covered by the hospital's fiscal year ending June 1999, the hospital had a patient eligible for both Medicare and Medicaid – a dual-eligible patient – who spent 365 patient days in the hospital that Medicare did not pay for because the patient had exhausted his Medicare hospital coverage.[1] Pl.'s Statement of Material Facts ("Pl.'s SMF") [Dkt. # 14] ¶¶ 2, 7. The fiscal intermediary that calculated Columbia St. Mary's DSH adjustment excluded the patient's 365 unpaid hospital days from the Medicaid numerator, because it interpreted the phrase "entitled" to Medicare benefits in the numerator to mean simply whether the patient was enrolled in Medicare or not, not whether the patient's hospital days were actually covered by the program. *See* PRRB Decision 2009-D27 ("PRRB Decision") at 4 (attached to Pl.'s SMF, Ex. A). In other words, because the patient with 365 unpaid Medicare days was both a Medicaid enrollee and a Medicare enrollee – and therefore, "entitled" to Medicare benefits, under the intermediary's interpretation, the patient's days were excluded from the hospital's calculation.

---

1       Medicare covers the first 90 days of a beneficiary's inpatient hospital care and provides an additional 60 "lifetime reserve days" of inpatient hospital coverage. *Catholic Health* n.3, citing 42 C.F.R. § 409.61(a).

Columbia St. Mary's appealed the fiscal intermediary's calculation to the PRRB, which decided the appeal in favor of the hospital.  PRRB Decision at 5.  It held that "entitled" to a benefit means "the absolute right to receive an independent and readily defined payment." *Id.*, citing *Jewish Hosp., Inc. v. Sec'y of Health and Human Services*, 19 F.3d 270, 275 (6th Cir. 1994).  Under that interpretation, the patient with 365 hospital days unpaid by Medicare should have been *in*cluded in the fraction because he had dual-eligibility and he was "not entitled" to Medicare benefits because his days had been unpaid.  In making this ruling, the PRRB relied on *Jewish Hospital*, which interpreted "entitled" to Medicare in the Medi*care* proxy of the calculation.  "The issue is not new and the Board has consistently applied the holdings of the Court in *Jewish Hospital*," which held that "entitled" to Medicare benefits means that benefits were actually paid.  *Id.*, citing *Jewish Hospital*, 19 F.3d at 275.

The Secretary, through the CMS, overturned the PRRB's decision.  *See* Ctrs. for Medicare and Medicaid Serv's Decision of the Adm'r, Rev. of PRRB 2009-D27 at 6 (attached to Pl.'s SMF, Ex. A).  CMS held that:

> [T]he statutory phrase in the Medicaid proxy "but who were not entitled to benefits under Medicare Part A of this title" forecloses the inclusion of the days at issue in this case in the numerator . . . . [I]t is the status of the patients, as opposed to the payment for the day, which determines whether a patient day is included in the numerator of the Medicaid proxy.

*Id.* at 5.

Columbia St. Mary's filed this suit challenging the Secretary's decision, and the parties have filed cross motions for summary judgment.  *See* Pl.'s Mot. for Summ. J. ("Pl.'s Mot.") [Dkt. # 12]; Def.'s Cross-Mot. for Summ. J. ("Def.'s Mot.") [Dkt. # 15].  After the parties briefed their motions for summary judgment, the D.C. Circuit issued *Northeast Hosp. Corp. v. Sebelius*, 657 F.3d 1 (D.C. Cir. 2012).  The parties briefed their views of the decision's effect on

this case.  *See* Pl.'s Status Report ("Pl.'s SR") [Dkt. # 26]; Def.'s Statement Re: Order dated Dec. 16, 2011 ("Def.'s SR") [Dkt. # 27].  Columbia St. Mary's and the Secretary requested, and the Court granted, a stay pending a determination of whether the parties in *Northeast Hospital Corp.* would seek review of that case by the U.S. Supreme Court.  Min. Order Dec. 14, 2011. When the parties in *Northeast Hospital Corp.* did not file a petition for writ of certiorari, Columbia St. Mary's and the Secretary advised the Court of this and notified the Court of two other new relevant decisions, *Catholic Health Initiatives v. Sebelius,* 841 F.Supp.2d 270 (D.D.C. 2012) and *Hall v. Sebelius*, 667 F.3d 1293 (D.C. Cir. 2012).  *See* Joint Status Report ("Joint SR") [Dkt. # 28].  The parties then briefed the effect of the two new decisions on this lawsuit.  *See* Def.'s Notice of Supplemental Authority ("Def.'s Notice") [Dkt. # 30]; Pl.'s Resp. Re: Notice of Supplemental Authority [Dkt. # 32]; Def.'s Reply [Dkt. # 33].

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  However, in cases involving review of agency action under the Administrative Procedure Act ("APA"), Rule 56 does not apply due to the limited role of a court in reviewing the administrative record.  *Select Specialty Hosp.-Akron, LLC v. Sebelius,* 820 F.Supp.2d 13, 21 (D.D.C. 2011).  Under the APA, the agency's role is to resolve factual issues and arrive at a decision that is supported by the administrative record, and the court's role is to "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985), citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971); *see also Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977).

Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5.U.S.C. § 706(2)(A), in excess of statutory authority, *id.* § 706(2)(C), or "without observance of procedures required by law," *id.* § 706(2)(D); *see also* 42 U.S.C. § 1395*oo*(f)(1). However, the scope of review is narrow. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). The agency's decision is presumed to be valid. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. at 415. Also, a court must not "substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. A court must be satisfied, however, that the agency has examined the relevant data and articulated a satisfactory explanation for its action, "including a rational connection between the facts found and the choice made." *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) (citations omitted) (internal quotation marks omitted).

In reviewing an agency's interpretation of a statute, courts use the two-step analysis outlined in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Step one involves determining whether Congress has spoken directly to the "precise question at issue," for if it has, then "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. If it has, then that is the end of the matter. *Id.*; *Nat'l Treasure Employees Union v. Fed. Labor Relations Auth.*, 392 F.3d 498, 500 (D.C. Cir. 2004). However, if the statute is silent or ambiguous on the question (*Chevron* "step two"), "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. The agency's interpretation only needs to be reasonable to warrant deference. *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 702 (1991).

III.    **ANALYSIS**

The parties' briefs on summary judgment set forth arguments about whether the statute supports the Secretary's current interpretation of the DSH adjustment provision, and their supplemental briefs address how the subsequent decisions from the D.C. Circuit Court of Appeals and the district court affect this case, including the issue of retroactive application of the rule.

A.    **Statutory Interpretation**

The dispute at the heart of this case concerns the meaning of the phrase "entitled to benefits under part A of this subchapter," i.e., Medicare, in the statute.   42 U.S.C. §1395ww(d)(5)(F)(vi).  Columbia St. Mary's takes the position that being entitled to Medicare benefits means that Medicare paid for the specific services in question.  The Secretary takes the position that it means a patient was a Medicare beneficiary, whether or not Medicare actually paid for the specific services.

Columbia St. Mary's argues that the Secretary's interpretation of the statute is inconsistent with the plain meaning of the statute and is unreasonable, arbitrary and capricious. Pl.'s Mot.at 1.  In arguing that "entitled" to Medicare part A in the Medicaid proxy means that that Medicare paid for a patient's services, the hospital relies, among other things, on *Jewish Hospital* and other circuit court cases that interpret the term "entitled" to Medicare part A in other parts of the DSH calculation that way.  *See* Mem. in Supp. of  Pl.'s Mot. for Summ. J. ("Pl.'s Mem.") at 10 (attached to Pl.'s Mot.).  If Columbia St. Mary's is correct, the 365 unpaid hospitals days for the patient at issue would be *included* in the numerator.  In the hospital's view, that patient was not "entitled" to Medicare part A benefits because Medicare did not actually pay

for his hospital days, so he met both criteria for his days to be included in numerator:  dual-eligibility and hospital days unpaid by Medicare.  *See id.* at 18–19.

The Secretary contends that "entitled" to Medicare part A benefits refers to an individual's status as a Medicare enrollee, not whether Medicare paid for specific services. Mem. of Points and Authorities in Supp. of Def.'s Cross-Mot. for Summ. J. ("Def.'s Mem.") at 18–19 (attached to Def.'s Mot.).  She argues, among other things, that the disputed term is defined by the Medicare statute, that the plain language of the statute and its legislative history support the agency's interpretation, and that the interpretation is reasonable.  *Id.* at 17–38. According to the Secretary, Columbia St. Mary's patient was "entitled" to Medicare part A benefits because of his status as a Medicare enrollee, regardless of whether Medicare paid for his hospital days.  *See id.* at 34.  Thus, his 365 days should be *excluded* from the numerator in the calculation because he was both a Medicare and a Medicaid enrollee, but the statute includes in the numerator only patient days for someone who is a Medicaid enrollee and *not* a Medicare enrollee.  *See id.* at 3.

After the parties briefed the summary judgment motions, the Court of Appeals for the D.C. Circuit issued two rulings that address what being "entitled" to Medicare means, *Northeast Hosp. Corp. v. Sebelius*, 657 F.3d 1 (D.C. Cir. 2011) and *Hall v. Sebelius*, 667 F.3d 1293 (D.C. Cir. 2012).  *Northeast Hospital Corp.* ruled, in part, on the meaning of "entitled" to Medicare in another part of the DSH calculation, and *Hall* discussed what being entitled to Medicare means in the context of whether Medicare beneficiaries can disavow their Medicare benefits.

*Northeast Hospital Corp.* involved the question of whether the hospital days of Medicare part C enrollees should be included in the Medicare fraction of the DSH calculation.  The lower court analyzed the Secretary's current interpretation of the term "entitled" to Medicare part A as

9

referring to a patient's status and held that this interpretation is not supported by the statutory language.  *Northeast Hosp. Corp. v. Sebelius*, 699 F.Supp.2d 81 (D.D.C. 2010).   The D.C. Circuit overturned that decision, ruling under the first prong of *Chevron* that "the Medicare statute does not unambiguously foreclose the Secretary's interpretation" that entitlement to part A benefits refers to a patient's status and not right to payment.  *See Northeast Hosp. Corp.*, 657 F.3d at 5−18, applying *Chevron*, 467 U.S. 837.  The Circuit did not reach the second prong of the *Chevron* analysis, however, because it concluded that in that case, the Secretary improperly applied her interpretation as it affected the Medicare part C enrollees retroactively to 1999–2002 calculations.  *Northeast Hosp. Corp.*, 657 F.3d at 13.

*Hall* analyzed what it means to be "entitled" to Medicare benefits given that the plaintiffs, who were 65 years old and entitled to Social Security benefits, could decline to request Medicare payments and can relinquish their Medicare benefits.   667 F.3d at 1294.   Because private insurers limit coverage to Medicare part A beneficiaries, plaintiffs in that case sought a legal declaration stating not only that they could choose to decline Medicare benefits but that the government *cannot* pay them on their behalf.  *Id.* at 1295.  The D.C. Circuit held that plaintiffs remain "entitled" to Medicare part A benefits under the law regardless of whether they accept the benefits that comes with that entitlement.  *Id*. at 1296.

Both of these decisions support the Secretary's interpretation of the statute, but neither entirely decides the question before this Court.   *Northeast Hosp. Corp.* ruled under the first prong of the *Chevron* analysis that the Secretary's interpretation is not foreclosed by the statute's language, but the decision did not go on to consider whether the interpretation was reasonable under the second prong of the *Chevron* analysis.   And although *Hall* discussed what being "entitled" to Medicare means in the context of that case, it did not address the question in the

context of the DSH statutory provision. This Court need not rule on whether the Secretary's interpretation is proper under *Chevron*, however, because as in *Northeast Hosp. Corp.* and in *Catholic Health*, it rules that even if the interpretation is proper, applying the interpretation retroactively to Columbia St. Mary's 1999 DSH calculation is improper.

### B. Retroactivity

*Catholic Health* addressed the same legal issues presented here, and the parties have briefed that decision's relevance to this case. Because the Court finds *Catholic Health* persuasive, it discusses that ruling's analysis and the parties' arguments about its effect on this case.

### i. *Catholic Health Initiatives v. Sebelius*

*Catholic Health* ruled that the Secretary's current application of the Medicaid numerator statute to a hospital's 1997 DSH adjustment an improper retroactive application of the statute.[2] 841 F.Supp.2d at 278. An agency may not promulgate a retroactive rule absent express congressional authorization. *Northeast Hosp.*, 657 F.3d at 13, citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). To determine whether a rule is impermissibly retroactive, the Court must "first look to see whether it effects a substantive change from the agency's prior regulation or practice." *National Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 860 (D.C. Cir. 2002). If the rule departs from established practice, the Court must then examine its impact, if any, on the legal consequences of prior conduct. *See id.* A rule that "alter[s] the past legal consequences of past actions" is retroactive; a rule that alters only the "future effect" of past actions, in contrast, is not. *Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 11 (D.C. Cir. 2006), quoting *Bowen,* 488 U.S. at 219 (Scalia, J., concurring) (internal quotation marks omitted). In

---

2       The Secretary has appealed the decision in *Catholic Health*. *Catholic Health Initiatives v. Sebelius*, *appeal docketed*, No. 12–5092 (D.C. Cir. Apr. 5, 2012).

other words, "[i]f a new rule is 'substantively inconsistent' with a prior agency practice and attaches new legal consequences to events completed before its enactment, it operates retroactively." *Arkema Inc. v. EPA*, 618 F.3d 1, 7 (D.C. Cir. 2010).

*Catholic Health* concluded that the record in that case demonstrated "conclusively that the Secretary was for including dual-eligible exhausted benefit days in the Medicaid fraction before she was against it." 841 F.Supp.2d at 278. Specifically, the court ruled that before 2000, the Secretary had a policy and practice of including dual-eligible unpaid Medicare benefit days in the Medicaid numerator, and that in 2000, she changed that policy to exclude those days from the numerator. *Id.* at 279–281. The court ruled that when the Secretary applied that new policy to Catholic Health's 1997 cost reports, she improperly applied the policy retroactively. *Id.* at 282. The Secretary does the same thing here.

### 1)   The Secretary's Rulemakings

*Catholic Health*'s analysis begins by setting forth any agency rules that existed before the Secretary issued any pronouncements about the disputed statutory provision. *Id.* at 278. In a 1986 interim final rule, the Secretary interpreted the phrase "entitled to benefits under part A of [Medicare]" in the Medi*care* fraction, as well as "eligible" for Medicaid in the Medi*caid* fraction as meaning covered or paid for days. *Id.* That interim final rule did not, however, expressly address the part of the calculation at issue in *Catholic Health* and here:  "entitled to benefits under part A of [Medicare]" in the Medi*caid* numerator. So, although there was a rule stating that "entitled" to Medicare benefits in the first fraction meant paid for by Medicare, as of 1986, there was no express rule on the meaning of the *exact same phrase* in the Medi*caid* fraction. *Id.* ("Left up in the air" is the question of whether, in 1986, the Secretary interpreted the phrase in the Medicaid numerator the same way it was interpreted in the Medi*care* fraction.)

This changed in 1995, when the Secretary issued a rule that stated:

> A hospital's disproportionate share adjustment is determined by calculating two patient percentages (Medicare Part A/Supplemental Security Income (SSI) covered days to total Medicare covered days, and *Medicaid but not Part A covered days* to total inpatient hospital days), adding them together, and comparing that total percentage to the hospital's qualifying criteria.

*Id.* at 279 (emphasis in original), quoting 60 Fed. Reg. 45,778, 45,811 (Sept. 1, 1995).  The emphasized language describes the Medicaid numerator as including inpatient days "covered," or paid for, by Medicaid, but not covered or paid for by Medicare.  In other words, the Secretary summarized the phrase "entitled to benefits under part A [of Medicare]" in the Medi*caid* fraction as meaning days paid for by Medicare.  This language appeared verbatim in three additional Federal Register notices in 1995 and 1996.  *Catholic Health*, 841 F.Supp.2d at 279, citing 60 Fed. Reg. 29,202, 29,244 (Jun. 2, 1995) (proposed rule); 61 Fed. Reg. 27,444, 27,273 (May 31, 1996) (proposed rule); 61 Fed. Reg. 46,166, 46, 206 (Aug. 30, 1996) (final rule).  Given these multiple administrative pronouncements, the court in *Catholic Health* reasoned that although the 1986 rulemaking did not expressly interpret "entitled to benefits under part A [of Medicare]" in the Medi*caid* fraction, as of 1995, the Secretary interpreted the phrase in both fractions to mean that Medicare had paid for the relevant patient days.  *Id.*

In addressing *Catholic Health's* analysis of these rules, the Secretary contends in the present case that the single "fleeting" sentence in the rules "was not intended to announce a substantive interpretation of the Medicaid fraction."  Def.'s Notice at 9.  But the Secretary chose to include the sentence in four Federal Register notices over fourteen months.  Whether the sentence was intended to announce a substantive interpretation of the Medicaid fraction or not, the rules reflect the Secretary's interpretation at that time of the DSH adjustment calculation.  In doing so, they repeatedly describe the Medicaid numerator as counting unpaid Medicare hospital

days.  And "fleeting" or not, the sentence is the only reference in the rules of the Secretary's interpretation of the phrase.

The Secretary also argues that because, at the time, "eligible" for Medicaid in the Medicaid fraction meant only covered days, "it is likely that any reference to 'covered' Medi*care* days in the Medi*caid* fraction was inadvertent – an example of a misplaced modifier."  *Id.*  In making this argument, the Secretary would have the Court rewrite the words of a sentence that the Secretary published, and re-published, in the Federal Register.  The fact that the Secretary included the exact same language in four separate notices suggests that the Secretary did not "misplace a modifier," but meant what she wrote.  *See, e.g., Motorola, Inc. v. United States*, 30 C.I.T. 1766, 1773 (2006), *aff'd,* 509 F.3d 1368 (Fed. Cir. 2007) ("Rules of statutory construction are similarly applicable to the Code of Federal Regulations, interpreting a statute."); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756 (1975) ("The starting point in every case involving construction of a statute is the language itself.").

Finally, the Secretary argues that these rules were not intended to interpret the term "entitled" to Medicare in the Medi*caid* fraction, suggesting the Court should simply ignore them.  Def.'s Notice at 9–10.  But the Secretary has not identified any other agency rule issued at the time that interpreted the term differently.  These four statements reflect the Secretary's contemporaneous understanding of the meaning the phrase at issue in this lawsuit, and this Court cannot rewrite or ignore them.

### 2)        The Secretary's Administrative Decisions

The rules cited in *Catholic Health* are not the only statements the Secretary made about the meaning of this phrase.  The court in that case also analyzed administrative determinations

issued by the Secretary after the 1995 and 1996 rules that reflected the agency's practice of including dual-eligible unpaid Medicare days in the Medicaid numerator.

### 1. *Presbyterian Medical Center*

*Presbyterian Medical Center of Philadelphia* was a 1996 administrative decision that involved two issues:  (1) the meaning of the phrase "eligible" for Medicaid in the first part of the Medicaid fraction and (2) how to treat "a number of days of care that were billed to Medicaid because the patients has exhausted their Medicare benefits."  *Presbyterian Med. Ctr. of Phila. v. Aetna Life Ins. Co.*, CMS Adm'r Dec., *available at* 1996 WL 887683 at *2 (H.C.F.A. 1996) (attached to Def.'s Notice, Ex. A).  On the second issue, *Presbyterian Medical Center* instructed that unpaid Medicare benefit days should be included in the Medicaid fraction, *id.* at 2 and 4, and the court in *Catholic Health* considered that to be significant:

> [O]n the exact question for this Court – namely, whether patient days attributable to patients who were eligible for Medicaid but who had exhausted their Medicare benefits should be included the Medicaid fraction – the Administrator affirmed the PRRB's decision, finding that such days "may be properly included in the DSH calculation . . . "

*Catholic Health*, 841 F.Supp.2d at 280, citing *Presbyterian Med. Ctr.*, 1996 WL 887683 at *4.

The Secretary argues that *Catholic Health* wrongly relied on *Presbyterian Medical Center* because that decision was not "focused" on the second issue of unpaid Medicare days, but rather on the first issue.  Def.'s Notice at 11.  *Catholic Health*, according to the Secretary, reads too much into the "single sentence" that addressed the second issue, emphasizing that the agency's discussion was "relegated to four sentences at the very end of the decision."  *Id.*

In making this argument, the Secretary acknowledges that *Presbyterian* specifically addressed the issue in dispute here.  *Id.* at 10.  The fact that this issue took fewer sentences to address than the first issue in the case makes it no less relevant or instructive.  Whether the Secretary needed four sentences or forty sentences to address the question, the instruction was

the same:  to include unpaid Medicare days in the Medicaid numerator "consistent with 42 C.F.R. 412.106."  *Id.* at 10.  And the fact that the Secretary could easily address the issue in that case supports the conclusion that the agency had an existing policy.  She did not need to provide a lengthy explanation given her repeated pronouncements starting in 1995 that the Medicaid numerator included "Medicaid but not Part A covered days."  *Id.* at 8.

To support her argument about *Presbyterian*, the Secretary directs the Court to a 1997 administrative memorandum about Health Care Finance Administrative Ruling 97-2.  Def.'s Notice at 12, citing Mem. Re:  HCFA Ruling 97-2 Instructions (Jun. 12, 1997) ("HCFA Mem.") (attached to Def.'s Notice, Ex. D).  Ruling 97-2 was a new rule the Secretary implemented to interpret the first part of the Medicaid numerator, the meaning of "eligible for [Medicaid]" in the Medicaid fraction numerator.[3]  Health Care Fin. Admin. Ruling 97-2 (Feb. 27, 1997) (attached to Def.'s Notice, Ex. C).  Before that new rule was promulgated, the agency had interpreted "eligible" for Medicaid to mean patient days paid for by Medicaid.  *Id.* at 2.  After it was issued, the agency interpreted the phrase to refer to the fact of Medicaid enrollment only.  *Id.* at 3.  The agency sent a memorandum to regional administrators explaining the change.  In it, the agency wrote that the statute

> precludes the counting of any patient days furnished to patients entitled to both Medicare Part A and Medicaid.  Therefore, once the State has verified the eligibility of the hospital's patient data for Medicaid purposes, the intermediary must determine if any of these days are dual entitlement days and subtract them from the calculation.

HCFA Mem. at 2.

---

[3] It was issued in response to adverse rulings from four circuit courts about the agency's interpretation of the term "eligible" for Medicaid, *Cabell Hunting Hosp., Inc. v. Shalala*, 101 F.3d 984 (4th Cir. 1996); *Legacy Emanuel Hosp. & Health Ctr. v. Shalala*, 97 F.3d 1261 (9th Cir. 1996); *Deaconess Health Servs. Corp. v. Shalala*, 83 F.3d 1041 (8th Cir. 1996) (per curiam), affirming 912 F.Supp. 438 (E.D. Mo. 1995); *Jewish Hosp., Inc. v. Secretary of Health and Human Servs.*, 19 F.3d 270 (6th Cir. 1994).

In citing this memorandum, the Secretary argues that if *Presbyterian* had "ushered" in a policy in November 1996 of including hospital days unpaid by Medicare in the Medicaid numerator, this 1997 memorandum would have mentioned the *Presbyterian* decision or the policy.  Def.'s Notice at 13.  The memorandum, the Secretary argues, shows that as of 1997, the Secretary's policy was to "exclude[] from the Medicaid fraction numerator hospitals days belonging to beneficiaries of Medicare Part A and Medicaid."  *Id.*  But *Catholic Health* did not hold that *Presbyterian* ushered in a new rule.  It held that *Presbyterian* reinforced the practice expressed in the 1995 rule.  *Catholic Health*, 841 F.Supp.2d at 279–80.

Further, the memorandum is not inconsistent with the policy stated in 1995 of including unpaid Medicare days in the Medicaid numerator.  It reiterates the new rule on the meaning of "eligible" for Medicaid, while remaining silent about what "entitled" to Medicare means in the second part of the numerator.  The memorandum instructs intermediaries first to verify with the State a patient's "eligibility" for, i.e., enrollment in, Medicaid, then determine if any of those days are "dual-entitlement days and subtract them."  HCFA Mem. at 2.  But the memorandum does not specifically answer the only question here – what dual-entitlement means – so there is no reason to conclude based on this evidence that subtracting "dual-entitlement days" cannot mean subtracting unpaid Medicare days, as the 1995 rule provided.

## 2. *Jersey Shore Medical Center*

*Catholic Health* next analyzed a 1999 administrative decision in which the Secretary vacated a PRRB decision to include dual-eligible unpaid Medicare benefit days, *Jersey Shore Medical Center v. Blue Cross & Blue Shield Ass'n*, CMS Adm'r Dec., *reprinted in* Medicare & Medicaid Guide (CCH) ¶ 80,153 (Jan. 4, 1999) (attached to Def.'s Notice, Ex. E).  *Catholic Health* did not read this decision to mean the policy to include such days in the Medicaid

numerator was no longer in effect, because the order to vacate resulted from a different issue. *Catholic Health*, 841 F.Supp.2d at 280.  The only reason the agency gave for vacating the issue of exhausted benefit days was to "avoid bifurcation" of the case.  *Id.* at 281.

The Secretary describes *Jersey Shore Medical Center* as the first time the agency was presented squarely with the issue of whether exhausted Medicare days should be included in the Medicaid numerator.  Def.'s Notice at 13.  The Secretary agrees that the question was dispensed with on procedural grounds but argues that if a settled policy of including unpaid benefit days in the numerator existed, the agency would have affirmed that part of the PRRB's decision. *Id.* at 14.  The court in *Catholic Health* concluded the opposite – that if the agency had such a policy, it would have made that clear and reversed the PRRB on that basis.  *Catholic Health*, 841 F.Supp.2d at 281.  In this Court's view, the procedural disposition of the matter leaves the Court with insufficient grounds to draw a conclusion either way.  In any event, the record in *Catholic Health* presented no additional information about *Jersey Shore Medical Center* after the agency issued it, *id.*, and the Secretary provides no further information about the case's subsequent history to this Court.[4]

### 3.     *Edgewater Medical Center*

*Catholic Health* found that it was not until almost two years later, in April 2000, that the Secretary first announced a clear rule excluding unpaid Medicare benefit days from the Medicaid numerator.  *Catholic Health* at 281.  She announced this in *Edgewater Med. Ctr. v. Blue Cross*

---

4        The Secretary did submit a December 4, 1998 memorandum that the Acting Deputy Director for the agency's Plan and Provider Purchasing Policy Group submitted for CMS's consideration in deciding *Jersey Shore Medical Center*.  Mem. Re: Office Hearings, Hearing Decision No. 99-D4; Jersey Shore Medical Center ("Jersey Mem.") (attached to Def.'s Notice, Ex. G).  That memorandum states the Acting Deputy Director disagreed with the PRRB's decision to include the unpaid Medicare days in the Medicaid numerator.  Jersey Mem. at 2.  But the Secretary did not adopt that position in the *Jersey Shore Medical Center* decision, again, dispensing with the issue on procedural grounds.

*Blue Shield Ass'n,* CMS Adm'r Dec., *available at* 2000 WL 1146601 (H.C.F.A.) at * 4 (attached to Def.'s Notice, Ex. H). The Secretary then formalized this rule change in a 2004 rulemaking. *Catholic Health* at 281-82, citing 69 Fed. Reg. 49,916, 49,099 (Aug. 11, 2004).

Although the Secretary agrees that *Edgewater* was the first case squarely raising and deciding how to count unpaid hospital days, she disagrees that it marks a substantive departure from prior practice. Def.'s Notice at 15. To demonstrate this, the Secretary points to the fact that the *Edgewater* decision italicized the phrase "entitled to" in the Medicaid fraction provision as proof the Secretary intended to interpret that provision. *Id.* at 16. The Secretary also submits a 2003 decision, *Castle Med. Ctr. Provider v. Blue Cross/Blue Shield Ass'n*, PRRB Dec. No. 2003-D6 (Sept. 12, 2003) (attached to Def.'s Notice, Ex. J), and *Mercy Med. Ctr. v. Wisconsin Physician Servs.*, PRRB Dec. No. 2010-D7 (Dec. 4, 2009) (attached to Def.'s Notice, Ex. K), a 2010 decision, for the proposition that the Administrator italicizes the language he intends to interpret. Def.'s Notice at 16. Whether the Secretary italicized particular text in these decisions or not, these decisions do not show that the agency interpreted the statute to exclude dual-eligible unpaid Medicare days from the Medicaid numerator *before* April 2000. They only show that the Secretary excluded dual-eligible unpaid Medicare days from the Medicaid numerator *after* April 2000. More importantly, the Secretary identifies no additional cases to support its argument that *before* April 2000 the agency "consistently interpreted the Medi*caid* fraction to *exclude* exhausted inpatient hospital coverage days." Def.'s Notice at 18 (emphasis in original).

Given the well-reasoned analysis in *Catholic Health* and the fact that the Secretary has not presented any new information or argument to warrant a contrary holding, the Court holds that before April 2000, the Secretary had a policy and practice of including unpaid Medicare benefit days in the Medicaid numerator of the DSH calculation. It was not until 2000, with

19

*Edgewater*, that the agency implemented a substantive change from that prior policy and practice, and began excluding unpaid Medicare days from the numerator.

ii.        **Columbia St. Mary's DSH Calculation**

The Court further holds that applying the agency's new policy to Columbia St. Mary's 1999 DSH calculation is an improper application of the rule on a retroactive basis.  An agency may not promulgate a retroactive rule without express congressional authorization.  *Northeast Hosp.*, 657 F.3d at 13, citing *Bowen*, 488 U.S. at 208(1988).  The Secretary has no congressional authorization to promulgate retroactive rules for DSH calculations.  *Northeast Hosp.,* 657 F.3d at 17.

As explained above, the Secretary's new rule departs from its established practice in 1999 of including unpaid Medicare days in the Medicaid numerator.  That departure applied to Columbia St. Mary's 1999 DSH calculation altered the past legal consequences of the hospital's past actions.  *Id* at 16–17.  Hospitals that serve a disproportionately large number of low income patients receive a statutorily mandated additional payment from the Secretary.  42 U.S.C. §1395ww(d)(5)(F)(i).  Whether a hospital qualifies for this payment and the payment amount depend on the hospital's DSH fractions.  *Northwest Hosp.*, 657 F.3d at 17.  A rule that alters the method for calculating those fractions, therefore, changes the legal consequences of treating low income patients.  *Id.*  Here, excluding 365 patient days from Columbia St. Mary's Medicaid numerator under the current rule reduces the hospital's DSH adjustment payment.  Thus, the Secretary's current interpretation of the statute, first applied in 2000 in the *Edgewater* decision, cannot be applied retroactively to Columbia St. Mary's fiscal year 1999 DSH calculation.

## IV.    CONCLUSION

For the reasons set forth above, the Court will grant Columbia St. Mary's motion for summary judgment, will deny the Secretary's cross-motion for summary judgment, will vacate the Secretary's final decision, and will remand the matter to the Secretary for further proceedings in accordance with this decision.

AMY BERMAN JACKSON
United States District Judge

DATE:  September 28, 2012